**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) JOHN D. LEE, JR., as Special Administrator of the Estate of CALEB LEE, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 19-CV-318-JED-JFJ |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | Jury Trial Demanded |
| (2) WILLIAM COOPER, D.O., | ) | |
| (3) JAMES CONSTANZER, APRN, | ) | Attorney Lien Claimed |
| (4) HOLLY MARTIN, APRN, | ) | |
| (5) VIC REGALADO, in his official capacity, | ) ) | |
| Defendants. | ) | |

**COMPLAINT**

**COMES NOW**, John D. Lee, Jr. ("Plaintiff"), as the Special Administrator of the Estate of

Caleb Lee ("Caleb"), deceased, and for his causes of action against the above-named Defendants,

alleges and states the following:

**PARTIES, JURISDICTION AND VENUE**

1.    Plaintiff is a citizen of Oklahoma and the duly-appointed Special Administrator of the

Estate of Caleb.  Plaintiff was also Caleb's father. The survival causes of action in this matter are

based on violations of Caleb's rights under the Fourteenth Amendment to the United States

Constitution under Oklahoma law.

2.    Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability

company doing business in Tulsa County, Oklahoma.  Turn Key is a private correctional health

care company that contracts with counties, including, during the pertinent timeframe, Tulsa

County, to provide medical professional staffing, supervision and care in county jails. Turn Key

was at all times relevant hereto responsible, in part, for providing medical services, supervision and

medication to Caleb while he was in the custody of the Tulsa County Sheriff's Office ("TCSO").

Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees.  Turn Key was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3.      Defendant William Cooper, D.O. ("Dr. Cooper") was at all times relevant hereto, an employee and/or agent of Turn Key/TCSO, who was, in part, responsible for overseeing Caleb's health and well-being, and assuring that Caleb's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Dr. Cooper was acting within the scope of his employment and under color of State law. Dr. Cooper is being sued in his individual capacity.

4.      Defendant James Constanzer, APRN ("Nurse Practitioner Constanzer"), was, at all times relevant hereto, an employee and/or agent of Turn Key/TCSO, who was, in part, responsible for overseeing Caleb's health and well-being, and assuring that Caleb's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Nurse Practitioner Constanzer was acting within the scope of his employment and under color of State law. Nurse Practitioner Constanzer is being sued in his individual capacity.

5.      Defendant Holly Martin, APRN ("Nurse Practitioner Martin"), was, at all times relevant hereto, an employee and/or agent of Turn Key/TCSO, who was, in part, responsible for overseeing Caleb's health and well-being, and assuring that Caleb's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Nurse Practitioner Martin was acting within the scope of her employment and under color of State law. Nurse Practitioner Martin is being sued in his individual capacity.

6. Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of State law. Sheriff Regalado is sued purely in his official capacity.  It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014).  Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought suit against the County/TCSO.  Tulsa County/TCSO is ultimately responsible for the well-being, including the health and safety, of inmates housed at the Tulsa County Jail.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

10. Prior to bringing this Complaint, Plaintiff complied with the tort claim notice provisions of the Oklahoma Government Tort Claim Act ("GTCA"), 51 O.S. § 151, *et seq.,* by notifying Defendants of his intent to file state law claims in connection with the events and injuries described herein. The GTCA process has been exhausted. This action is timely brought pursuant to 51 O.S. § 157.

11.   Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**STATEMENT OF FACTS**

12.   Paragraphs 1-11 are incorporated herein by reference.

**A.  Facts Specific to Caleb**

13.   Caleb was booked into the Tulsa County Jail on September 8, 2017.

14.   During the book-in process, on September 8, Turn Key nurse Jessica Mobley, LPN ("Nurse Mobley"), filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Caleb had been treated at a "methadone clinic" just two days prior, on September 6, 2017, the date of his arrest.  During the intake screening process, Nurse Mobley further documented that Caleb: (A) took 140mg of methadone "daily", with his last dose taken "48 hours ago"; (B) had a history of heroin abuse; (C) had used methadone for the preceding three (3) years; (D) suffered from "cardiac disease"; (E) had been admitted for inpatient treatment at a methadone clinic within the previous 2 days; (F) had high blood pressure; (G) was experiencing withdrawal symptoms; (H) had a history of withdrawal seizures; and (I) had previously attempted suicide.

15.   Yet, despite Caleb's serious and deeply concerning medical and mental health history, including present opioid withdrawal, Nurse Mobley determined that Caleb did not need to be referred to a medical or mental health professional.  Nurse Mobley further medically cleared Caleb for housing in the Jail's general population.

16.   As early as the morning of September 9, 2017, Caleb reported to medical staff (Turn Key nurse Terri Taylor) that he was experiencing hallucinations that were causing him "significant distress or impaired functioning".  Caleb additionally stated to Nurse Taylor that he had been on methadone and had a heavy heroin habit of one gram every night.  Nurse Taylor set a "high

priority" appointment for Caleb with a mental health professional.   However, for unknown

reasons, that appointment was "deleted" from the schedule by Turn Key psychologist, Alicia Irvin.

17.   By the night of September 9, Caleb was experiencing nausea, a runny nose, moist palms,

achy bones and goosebumps, all symptoms of opioid withdrawal.

18.   By the morning of September 10, Caleb was having observable tremors.  He was plainly

and obviously in the throes of opioid withdrawal.  He was also experiencing Stage 2 hypertension.

19.   Caleb continued to exhibit obvious, documented and serious symptoms of a serious medical

condition for days, with his symptoms worsening by the day. On September 11, he continued to

have Stage 2 hypertension, and his high blood pressure was uncontrolled.

20.   On September 12, at around 10:30 p.m., Caleb communicated to Turn Key nurse Casey

Combs that he was feeling suicidal.  His hypertension increased to levels of 160/61 and 151/94.

21.   On September 13, 2017, at around 10:30 a.m., Caleb had an encounter with Turn Key

employee Theresa Hall, LPC.   Ms. Hall noted that Caleb presented with "anxiety and

psychomotor agitation" and that his "face was shaking confused…."

22.   At around 10:00 p.m. on September 13, Caleb again informed Nurse Combs that he was

suicidal.

23.   On September 14, at approximately 6:00 a.m., nurse Jesse Misthaven reported that Caleb's

skin was "cool", "pale" and "diaphoretic".  Nurse Misthaven additionally observed that Caleb had

not been eating due to nausea and vomiting.

24.   By the morning of September 18, Caleb's condition was obviously dire and emergent.  As

charted by purported mental health professional, Rob True, Caleb had continued to refuse meals.

Mr. True also noted that Caleb "appeared to be responding to internal stimuli." According to

True, Caleb stated "I'm waiting for this guy in front of me to move so I can watch the movie", but

there was no "guy" or "movie" in the cell.  In reality, Caleb was staring at a blank cell wall. True

opined that Caleb had "dysphoric mood and bizarre affect." True diagnosed Caleb with "psychosis."

25.   In addition, Caleb's hypertension had reached nearly a crisis level (170/88) and his pulse rose to levels of 134 beats per minute.

26.   Caleb's onset of hallucinations and abnormal vital signs were clear signals that there was an underlying and emergent medical condition beyond opioid withdrawal.

27.   During the early afternoon of September 18, Caleb was seen by Turn Key psychiatrist, Jawaun Lewis, D.O. ("Dr. Lewis").  Dr. Lewis summarized his meeting with Caleb as follows:

> [Caleb] has not ate [sic] since Saturday, spoke with therapist and security...this is day ten of admission has a history of opioids and methadone … I cannot find any prior mental health history at this time concern may be a protracted detox? [Caleb] ***visibly shakes and is delusional . …Therapist and security concerned about deteriorating status. Will send to medical for <u>emergent</u> eval[uation].***

(emphasis added).  Dr. Lewis described Caleb's condition as ***"severe" and opined that his "adaptive functioning" was in decline.***

28.    Thus, by September 18, it was plainly obvious, even to the layperson security staff, that Caleb was deteriorating.  He had not eaten for days, had extremely high blood pressure and was visibly shaking and hallucinating.  Caleb had been in Jail for ten (10) days and his condition was only getting worse. Dr. Lewis was concerned enough to characterize the situation as ***"emergent."***

29.   However, Caleb was not sent to the hospital nor seen by a physician on an emergent basis. Indeed, and in deliberate indifference to his serious medical needs, Caleb was never seen by a physician during his detention at the Jail.

30.   At around 2:45 p.m. that afternoon, Caleb was seen by an "APRN", Defendant James Constanzer ("Nurse Practitioner Constanzer").  As documented by Nurse Practitioner Constanzer, Caleb had no "underlying mental health condition to contribute to [his observed] psychosis" Constanzer noted "symptoms of delirium".  More specifically, according to Constanzer, Caleb

6

*believed he was on a boat or ship speaking to his attorney* and that there were chemicals in his food.  Moreover, Constanzer charted Caleb's *"tachycardia" and visible tremors*.  He still had Stage 2 hypertension.

31.    Despite all of these concerning signs of Caleb's emergent need for evaluation and treatment by a physician, which strongly indicated an urgent medical condition beyond opioid withdrawal, Constanzer opined that Caleb's prognosis was "good."  In deliberate indifference to Caleb's serious and obvious medical needs, Nurse Practitioner Constanzer did not send him to a hospital or even refer him to a physician.  Even more troubling, Nurse Practitioner Constanzer never saw Caleb again after September 18, and cancelled numerous appointments to see Caleb, including an "urgent referral" on September 20.

32.    Because delirium and psychosis are rare symptoms of opioid withdrawal, Caleb's continuing psychosis, hypertension and tachycardia, ten (10) days after he arrived at the Jail (and twelve (12) days after he last took any methadone), were clear signs of an obvious medical emergency.   Nurse Practitioner Constanzer's failure to treat Caleb's condition as emergent, and his decision to keep Caleb at the Jail, rather than refer him for immediate evaluation by a physician or transport him to a hospital, constitutes deliberate indifference to a serious medical need.

33.    In the days after September 18, Caleb continued to display clear and obvious signs of an emergent and declining mental and physical state. His hypertension was never brought under control and his acute psychosis and delirium persisted.

34.    At around 6:45 p.m. on September 20, 2017, Caleb was observed screaming "Get away! Get away!" in his cell. Turn Key/Jail nurse Charity Chumley charted an increase in "paranoia", "agitations" and "hallucinations". Particularly, as stated in Nurse Chumley's note, Caleb was again having visual hallucinations, believing that another woman was in the cell who was not, in fact,

there. Apparently, Caleb was screaming at his hallucination.  Caleb's "outburst" was also observed by the Jail's Health Services Administrator ("HSA").

35.    Nurse Chumley's September 20 note also indicates that Defendant William Cooper, D.O. *("Dr. Cooper") was notified of Caleb's increase in "paranoia", "agitations" and "hallucinations".*  Nonetheless, Dr. Cooper never saw Caleb or made any effort to evaluate him despite the obvious and emergent need.  On the contrary, Dr. Cooper cancelled an appointment to evaluate Caleb, set by Nurse Chumley, on September 20.  Dr. Cooper did not even order that Caleb's vital signs be taken despite his persistent hypertension and tachycardia. And Caleb's vitals were not taken on September 19, 20 or 21.   Dr. Cooper had knowledge that Caleb was at substantial risk of harm and utterly disregarded that risk.  Dr. Cooper was deliberately indifferent to Caleb's serious medical needs.

36.    The next day, September 21, at approximately 10:20 a.m., Turn Key nurse "S. Shingleton" noted that Caleb was still having visual hallucinations of a "movie" that was not real. Once again, Caleb's vital signs were not taken.

37.    On the morning of September 22, at around 9:30 a.m., Caleb complained to Nurse Shingleton of *pain of 10 on a scale from 1 to 10.*  On information and belief, Caleb was experiencing chest pain which was a medical emergency requiring transport to the hospital.  This significant change in Caleb's condition was completely ignored.   He received no treatment, assessment or evaluation with respect to sudden and extreme increase in pain.  Nurse Shingleton also charted that Caleb has refused his last five (5) meals.  Caleb's vital signs remained abnormal, with tachycardia and Stage 2 hypertension noted.

38.    At 9:56 a.m. on September 22, 2017, despite Caleb's continuing, serious and grave condition, Nurse Practitioner Constanzer decided to discharge Caleb from the medical unit, with a plan to follow up with him in "7 days". Nurse Practitioner Constanzer did not actually see Caleb

before discharging him from the medical unit, and Caleb was never assessed by a physician. Constranzer ignored and utterly disregarded Caleb's reported and excessive increase in pain and refusal of meals before discharging him from the medical unit.  Nurse Practitioner Constanzer's decision to discharge Caleb from the medical unit under these circumstances constitutes deliberate indifference to his serious medical needs.

39.    On information and belief, Caleb continued to experience pain, delirium, hallucinations, hypertension and tachycardia on September 23, 2017 while housed in a general population cell. On information and belief, detention and medical staff were deliberately indifferent to these serious medical needs.

40.    On the morning of September 24, 2017, at approximately 9:50 a.m., a "medical emergency" was called by TCSO detention staff in F-Pod (F-21), due to Caleb's frantic complaints of chest pain and seeming inability to stand or walk.  Nurse Shingleton responded to the medical emergency.

41.    When Nurse Shingleton arrived on unit, Caleb was on the floor, diaphoretic and confused. He was complaining about chest pain.  Nurse Shingleton and "Nurse Reese, LPN" attempted to "walk" Caleb to the gurney. According to Nurse Shingleton, Caleb began causing a disturbance and acting erratically when TCSO detention staff put Caleb down on the floor and handcuffed him.  The detention officers allegedly walked Caleb to the medical unit in handcuffs. As charted by Nurse Shingleton, "[w]hen [Caleb] arrived in medical, [he] sat down in chair and became very pale and started foaming at the mouth and had a seizure that lasted approximately 10 seconds." According to Shingleton, Caleb was "uncuffed and was layed [*sic.*] on the floor as soon as the seizure began." His pulse was weak.  His respirations were shallow. EMSA was called.

42.    When EMSA arrived, it was observed that there was a Jail "physician on the scene", believed to be Holly Martin, APRN ("Nurse Practitioner Martin"), but that this "physician on

scene" merely stood by Caleb's head and ***did "not offer any treatment help".*** Turn Key/TCSO had no medication available to stop the seizure and Nurse Practitioner Martin provided no assistance to the EMSA personnel in stopping or treating the seizure. Nurse Practitioner Martin's failure and refusal to provide any treatment or medical assistance under the circumstances constitutes deliberate indifference to Caleb's serious medical needs.

43.　Caleb was taken to OSU Medical Center, where he was pronounced dead at 11:25 a.m. The impression was that Caleb died from a cardiopulmonary arrest with noted gastrointestinal bleeding.  He was just twenty-five years old.

## B. The Jail's Unconstitutional Health Care Delivery System / Policies and Customs

44.　The deliberate indifference to Caleb's serious medical needs, his mental health and his safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

45.　There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies and the substantial risks they pose to inmates like Caleb but failed to take reasonable steps to alleviate those deficiencies and risks.

46.　For instance, in 2007, the NCCHC, a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health

care needs in a timely manner. NCCHC made these findings of deficient care despite Former Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

47.     Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

48.     There is a long-standing failure to secure adequate mental health care, and to properly classify and protect inmates with obvious and serious mental health needs.  For example, in 2009, TCSO was cited by the Oklahoma State Department of Health for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia.

49.     In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail.  The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested.  Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles").  Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" (hereinafter, "Gondles Report").  The Gondles Report was provided to the Jail Administrator, Michelle Robinette.  As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's former medical provider, CHC.  After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain and CHC/CHM.

50.     Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to CHM misreporting the average daily inmate population;

(b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months.  Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider."  Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD").  According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

51.     Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations.  TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended. Id.

52.     On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager".  In the email, Ms. Wyrick voiced concerns about whether the Jail's medical provider, Defendant CHMO, a subsidiary of CHC, was complying with its contract.  Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now - what else will be coming? It is one thing to say we have a contract ... to cover medical services, it is another issue to ignore any and all signs we receive of possible [medical] issues or violations of our agreement with [CHC] for [health] services in the jail.  The bottom line is, the Sheriff is statutorily obligated to provide medical services."

53.     NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

54.     NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, inter alia, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year"; The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor."

55.     Former Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Former Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

56.     Over a period of many years, Tammy Harrington, R.N., former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack

of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

57.     On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system - pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years".

58.     Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

59.     On the contrary, less than 30 days later the ICE-CRCL Report was issued, on October 27, 2011 another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.  A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams.

60.     In the wake of the Williams death, which was fully investigated by TCSO, Former Sheriff Glanz made no meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

61.     On November 18, 2011 AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality."  AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each.

62.     It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

63.     In November 2013, BOCC/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staff was still undertrained and inadequately supervised and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff Glanz and ARMOR (which provided financial disincentives for the transfer of inmates in need of care from an outside facility).

64.     In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by ARMOR to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold

15

more than $35,000 in payments.  Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

65.     In 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

66.     For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County.

67.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

68.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

69.     These policies or practices include, but are not limited to the following:

    a.   chronic reliance on lower-level providers *e.g.*, practical nurses instead of nurses or physicians, to make threshold decisions regarding care or elevating care;

16

b.   chronic understaffing that impairs the ability of existing staff to complete contracted tasks in a timely manner;

c.   chronic understaffing that prevents Turn Key from timely responding to inmate requests for mental health care;

d.   absence of accountability in the administration of physician prescribed medication; and

e.   Underutilization of diagnostic techniques and technologies (x-rays, ultrasounds, MRI, *etc.*)

70.     Turn Key also has a policy, practice or custom of understaffing county jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Caleb, with complex and serious medical needs.

71.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs.

72.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

73.     Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Caleb's.

74.     For instance, in June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

75. An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

76. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost consciousness.

77. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.   Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated.  Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

78. In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he***

> *likely developed the beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic.*

(emphasis added).

79.     TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Caleb at excessive risk of harm.  However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Caleb.

80.     Turn Key has maintained a custom of inadequate medical care at a corporate level which poses excessive risks to the health and safety of inmates like Caleb.

81.     In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Caleb, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

82.     TCSO's failure to train and supervise Jail staff was admitted in 2018, the year following Caleb's death, by the TCSO Jail Administrator, who sent an email to Jail supervisors concerning Jail staff's many failures, in which he concludes: "What I see now is either people don't have the abilities to complete or excel in their positions which means we as a whole have failed. We either didn't train them, we didn't challenge them, we didn't hold them accountable (which doesn't always mean discipline)...."

## ABSENCE OF FEDERALISM BAR TO *MONELL* CLAIM AGAINST TURN KEY

83.     The federalism concern that compelled the *Monell* Court to erect a bar against *respondeat superior* liability for § 1983 claims against municipal entities has no application to Turn Key, a private entity. *See e.g.*, *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 795 (7th Cir. 2014) ("[A]

new approach may be needed for whether corporations should be insulated from *respondeat superior* liability under § 1983.").

**CAUSES OF ACTION**

**I.**

**VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)**

84.    Paragraphs 1-83 are incorporated herein by reference.

**A.    Underlying Violations of Constitutional Rights/Individual Liability**

85.    The Turn Key/TCSO staff, including Dr. Cooper, Nurse Practitioner Constanzer and Nurse Practitioner Martin, as described above, knew there was a strong likelihood that Caleb was in danger of serious harm.

86.    As described *supra*, Caleb had serious and emergent medical issues that were known and obvious to the Turn Key/TCSO employees/agents, including Dr. Cooper, Nurse Practitioner Constanzer and Nurse Practitioner Martin. It was obvious that Caleb needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed.  Indeed, Nurse Practitioner Martin flatly refused to provide any assistance to Caleb even as he was having a seizure and cardiac event right in front of her. Turn Key/TCSO employees/agents, including Dr. Cooper, Nurse Practitioner Constanzer, disregarded the known, obvious and substantial risks to Caleb's health and safety.

87.    As a direct and proximate result of this deliberate indifference, as described above, Caleb experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, medical expenses, and death.

88.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary

and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Caleb's rights secured by the U.S. Constitution, including punitive damages.

**B.    Municipal/"Monell" Liability (Against Turn Key)[1]**

89.    Paragraphs 1-88 are incorporated herein by reference.

90.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[2]

91.    At all times pertinent hereto, Turn Key was acting under color of State law.

92.    Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

93.    Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

94.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

95.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Caleb's serious

---

[1]    "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], **or** for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus he need not establish that Turn Key had final policymaking authority for Tulsa County.

[2]    "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005).

medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key (*See, e.g.,* ¶¶ 44-83, *supra*).

96.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Caleb.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Caleb's, serious medical needs.

97.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

98.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Caleb's injuries and damages as alleged herein.

99.    Turn Key is also vicariously liable for the deliberate indifference of its employees and agents.

### C.    Official Capacity Liability (Against Sheriff Regalado)

100.    Paragraphs 1-99 are incorporated herein by reference.

101.    The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being deliberately indifferent to Caleb's health and safety and violating Caleb's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

102.    Such policies, customs and/or practices are specifically set forth in paragraphs 44-83, *supra*.

103.    The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Caleb's, health and safety.

104.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Caleb suffered injuries and damages as alleged herein.

## II.

### Negligence
### (Turn Key)

105.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 104 as though fully set forth herein.

106.    Turn Key and its employees, including Dr. Cooper, Nurse Practitioner Constanzer and Nurse Practitioner Martin, owed a duty to Caleb, and all other inmates in custody at the Jail, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

107.    Turn Key, Dr. Cooper, Nurse Practitioner Constanzer and Nurse Practitioner Martin breached that duty by failing to provide Caleb with prompt and adequate medical and mental health care despite Caleb's obvious needs.

108.    Turn Key, Dr. Cooper, Nurse Practitioner Constanzer and Nurse Practitioner Martin's breaches of the duty of care include, inter alia: failure to treat Caleb's serious health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly and adequately evaluate Caleb's health; failure to properly monitor Caleb's health; failure to provide access to medical and mental health personnel capable of evaluating and treating his serious health needs; failure to assure that Caleb received necessary emergency care; and a failure to take precautions to prevent Caleb from injury.

109.    As a direct and proximate result of Turn Key, Dr. Cooper, Nurse Practitioner Constanzer and Nurse Practitioner Martin's negligence, Caleb experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

110.     As a direct and proximate result of this negligence, Plaintiff is entitled to real and actual damages, including damages for medical expenses, mental and physical pain and suffering, emotional distress, death, lost wages and other damages in excess of $75,000.00.

111.     Turn Key is vicariously liable for the negligence of its employees and agents.

112.     Turn Key is also directly liable for its own negligence.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen

Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Muskogee, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

***Attorneys for Plaintiff***