# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

JOHN D. LEE, JR., as Special Administrator )
of the Estate of Caleb Lee, deceased, )
)
      Plaintiff, )
)
v. ) Case No. 19-CV-00318-GKF-JFJ
)
TURN KEY HEALTH CLINICS, LLC, )
WILLIAM COOPER, D.O., )
JAMES CONSTANZER, APRN, )
HOLLY MARTIN, APRN, and )
VIC REGALADO, in his official capacity, )
)
      Defendants. )

## OPINION AND ORDER

This matter comes before the court on the Motion to Dismiss [Doc. 20] of defendant Turn Key Health Clinics, LLC. Turn Key seeks dismissal with prejudice of plaintiff's claims. For the reasons set forth below, the motion is granted in part and denied in part.

**I. Allegations of the Complaint**

Plaintiff John D. Lee, Jr., as the Special Administrator of the Estate of Caleb Lee, alleges the following facts relevant to Turn Key's motion to dismiss.

Caleb Lee, age 25, was booked into the Tulsa County Jail on September 8, 2017. [Doc. 2, ¶ 13]. On September 24, 2017, while still detained, Lee died as a result of a cardiopulmonary arrest with noted gastrointestinal bleeding.[1] [*Id.* ¶ 43]. Plaintiff alleges that Turn Key's

---

[1] A more complete summary of plaintiff's factual allegations regarding the medical care provided to Lee while he was detained at the Tulsa County Jail can be found in the court's February 20, 2020 Order that denied the motions to dismiss of defendants James Constanzer and Holly Martin. [Doc. 38].

"inadequate or non-existent policies and customs" were a moving force behind Lee's injuries and violation of his constitutional rights. [*Id.* ¶ 72].

Defendant Turn Key Health Clinics, LLC is a private correctional health care company that contracted with Tulsa County to provide medical professional staffing, supervision, and care in the Tulsa County Jail, beginning in 2016. [*Id.* ¶¶ 2 and 65]. Turn Key was additionally responsible, in part, for creating, implementing, and maintaining policies, practices, and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. [*Id.* ¶ 2]. Plaintiff alleges that deliberate indifference to Lee's serious medical needs, his mental health, and his safety was in furtherance of, and consistent with, policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing. [*Id.* ¶ 44].

Plaintiff alleges that there are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. [*Id.* ¶ 45]. For instance, in 2007, the NCCHC, a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite former Sheriff Stanley Glanz/Tulsa County Sheriff's Office's ("TCSO") alleged efforts to defraud the auditors by concealing information and falsifying medical records and charts. [*Id.* ¶ 46]. Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings. [*Id.* ¶ 47]. In 2009, the

Oklahoma State Department of Health cited TCSO for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia. [*Id.* ¶ 48].

In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail. The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested. Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail, and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" ("Gondles Report"). The Gondles Report was provided to the Jail Administrator, Michelle Robinette. [*Id.* ¶ 49]. Among the issues identified by Dr. Gondles in her Report were: (a) understaffing of medical personnel due to CHM [Correctional Health Management, a predecessor healthcare provider] misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (f) nurses failing to document the delivery of health services; (g) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months. Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider." Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD"). According to Dr. Gondles,

without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system. [*Id.* ¶ 50]. TCSO leadership allegedly chose not to follow Dr. Gondles' recommendations. [*Id.* ¶ 51].

On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager," in which she voiced concerns about whether the Jail's then-medical provider was complying with its contract.[2] [*Id.* ¶ 52].

NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation. [*Id.* ¶ 53]. NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 report, NCCHC found as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year"; "The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "The responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "Diagnostic tests and speciality consultations are not completed in a timely manner and are not ordered by the physician"; "If changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "Potentially suicidal inmates [are not] checked irregularly [*sic*], not to exceed 15

---

[2] Plaintiff specifically alleges that "Ms. Wyrick voiced concerns about whether the Jail's medical provider, Defendant CHMO, a subsidiary of CHC, was complying with its contract." [*Id.* ¶ 52]. Neither CHMO nor CHC are parties to this litigation.

minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor." [*Id.* ¶ 54]. Former Sheriff Glanz allegedly only read the first two or three pages of the 2010 NCCHC Report, and was unaware of any policies or practices changing in the Jail in response to 2010 NCCHC Report. [*Id.* ¶ 55].

Over a period of many years, Tammy Harrington, R.N., a former Director of Nursing at the Jail, observed and documented many deficiencies in the delivery of health care service to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail. [*Id.* ¶ 56].

On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system—pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees—as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly"; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor"; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years.'" [*Id.* ¶ 57]. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued. [*Id.* ¶ 58]. Rather, less than 30 days after the ICE-CRCL Report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail. A federal jury has since entered a

verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams. [*Id.* ¶ 59]. Plaintiff alleges that, in the wake of Williams' death, which was fully investigated by TCSO, former Sheriff Glanz made no meaningful improvements to the medical system, as evidenced by the fact that another inmate, Gregory Brown, died just months after Mr. Williams, allegedly due to grossly deficient care. [*Id.* ¶ 60].

On November 18, 2011, AMS-Roemer, the Jail's retained medical auditor, issued its Report to former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality." AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each. [*Id.* ¶61].

Plaintiff alleges former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff." [*Id.* ¶ 62].

In November 2013, BOCC/TCSO/former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, plaintiff alleges this step did not alleviate the constitutional deficiencies with the medical system because medical staff was still undertrained and inadequately supervised, and inmates were still denied timely and sufficient medical attention. [*Id.* ¶ 63].

In February 2015, an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by Armor to abide by its contract with the County. Mariani also wrote three (3) memos notifying TCSO that Armor failed to staff various medical positions in the Jail and recommending that the County withhold more than $35,000 in payments. Her report showed that Jail medical staff often failed to respond to inmates' medical needs and that Armor failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence." [*Id.* ¶ 64].

In 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained. [*Id.* ¶ 65].

For a time in recent years, Turn Key was the largest private medical care provider to county jails in the state. [*Id.* ¶ 66]. To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin. [*Id.* ¶67]. There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of healthcare services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care. [*Id.* ¶ 68]. These policies or practices include, but are not limited to the following:

    a.    chronic reliance on lower-level providers, *e.g.*, practical nurses instead of nurses or physicians, to make threshold decisions regarding care or elevating care;

      b.      chronic understaffing that impairs the ability of existing staff to complete contracted tasks in a timely manner;

      c.      chronic understaffing that prevents Turn Key from timely responding to inmate requests for mental health care;

      d.      absence of accountability in the administration of physician prescribed medication; and

      e.      underutilization of diagnostic techniques and technologies (x-rays, ultrasounds, MRI, etc.).

[*Id.* ¶ 69].

Plaintiff alleges Turn Key also has a policy, practice, or custom of understaffing county jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor, or treat inmates with complex and serious medical needs. [*Id.* ¶ 70]. Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs. [*Id.* ¶ 71].

Plaintiff alleges that Turn Key's corporate policies, practices and customs have resulted in deaths or negative medical outcomes in numerous cases. [*Id.* ¶ 73]. For instance,

- In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. The man, Anthony Huff, ultimately died restrained in the chair. [*Id.* ¶ 74].

- An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death. [*Id.* ¶ 75].

- A man in the Creek County Jail died in September 2016 from a blood clot in his lungs after his repeated complaints—over several days—of breathing problems were disregarded by responsible staff, and he lost consciousness. [*Id.* ¶ 76].

- Another man, Michael Edwin Smith, became permanently paralyzed in the Muskogee County Jail in the summer of 2016 when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him. [*Id.* ¶ 77].

- In November of 2016, Muskogee County Jail and Turn Key staff allegedly disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon: [Mr. Buchanan] is a 54-year-old gentlemen who had a very complicated history . . . . [H]e was involved in being struck by a car while riding bicycle several weeks ago . . . . He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection in result of his critical illness [and] hospitalization, but then while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic." [*Id.* ¶ 78].

For the foregoing reasons, plaintiff alleges that Turn Key has maintained a "custom of inadequate medical care at a corporate level which poses excessive risks to the health and safety of inmates." [*Id.* ¶ 80]

Based on these general allegations, plaintiff asserts two claims against Turn Key. The first, under the federal civil rights statute, 42 U.S.C. § 1983, for municipal liability. The second, negligence under Oklahoma state law. Turn Key moves to dismiss with prejudice for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6).[3]

---

[3] Turn Key's motion to dismiss also seeks dismissal for insufficient service of process under FED. R. CIV. P. 4. [Doc. 20, p. 1]. However, the motion includes no briefing with respect to Rule 4 and therefore the court does not consider dismissal based upon insufficient service of process.

## II. Motion to Dismiss Standard

Federal Rule of Civil Procedure 8 requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court accepts as true all factual allegations, but the tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678.

## III. Analysis

As previously stated, the Complaint asserts a §1983 claim against Turn Key, as well as a state-law negligence claim, premised on failure to provide adequate medical care to Lee, a pretrial detainee.[4] The court separately considers each claim.

### A. § 1983 Claim

Turn Key alleges that plaintiff fails to state a plausible constitutional claim based on three separate contentions: (1) plaintiff has failed to allege sufficient facts to show that Lee suffered a constitutional deprivation; (2) plaintiff has failed to allege facts sufficient to state a constitutional

---

[4] The Complaint does not explicitly allege that Lee was a pretrial detainee, rather than a convicted prisoner. However, the Complaint seeks § 1983 relief on the basis of a violation of Lee's rights under the Fourteenth Amendment, not the Eighth Amendment. Unlike convicted prisoners, pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment. *See Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999). Thus, for purposes of this order, the court presumes that Lee was a pretrial detainee.

claim based on a municipal liability theory[5]; and (3) any claim for punitive damages against Turn Key must be dismissed.

For the reasons set forth in the court's February 20, 2020 Order, the Complaint states a § 1983 claim against defendants Martin and Constanzer for deliberate indifference to a serious medical need in violation of Lee's rights under the Due Process Clause of the Fourteenth Amendment. [Doc. 38]. Thus, plaintiff has alleged sufficient facts to show that Lee suffered a constitutional deprivation.

Plaintiff asserts that Turn Key may be liable for municipal liability pursuant to two separate theories: (1) the existence of a policy or custom that caused the constitutional violation, and (2) *respondeat superior*. The court first considers whether plaintiff sufficiently alleges the existence of a policy or custom that caused the asserted constitutional violation.

1. Policy or Custom

To establish municipal liability under § 1983, "a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."[6] *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)

---

[5] Turn Key does not dispute that the *Monell* theory of municipal liability under § 1983 applies to private entities acting under the color of state law. *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003).

[6] In the motion, Turn Key cites the Supreme Court's decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), and argues that "[t]he municipal theory of liability cannot be applied to Turn Key, as Turn Key does not have the final decision-making authority for the Tulsa County Jail." [Doc. 20, pp. 19-20]. However, as consistently recognized by courts in this Circuit, "*Pembaur* provides an alternative means of establishing municipal liability" to a *Monell* theory. *Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1256 (N.D. Okla. 2015); *see also Mikus v. Corr. Healthcare Mgmt. of Okla.*, *Inc.*, No. 13-CV-120-JED-JFJ, 2019 WL 845416, at *8 (N.D. Okla. Feb. 20, 2019); *Birdwell v. Glanz*, No. 15-CV-304-TCK-FHM, 2016 WL 2726929, at *6 (N.D. Okla. May 6, 2016). "That form of establishing municipal liability is *in addition to* the settled method of showing that the entity's policy was the moving force behind the denial of a

(quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). The Tenth Circuit has recognized that

> [a] municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Id.* (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)).

As discussed in the court's February 20 Order, plaintiff plausibly alleges that Constanzer was deliberately indifferent to Lee's medical needs by, among other things, failing to refer Lee to a physician, canceling appointments, and discharging Lee from the medical unit without seeing him. Plaintiff also plausibly asserts that Martin violated Lee's constitutional rights by failing to offer any treatment on September 24. [Doc. 38]. However, read in the light most favorable to plaintiff, the Complaint fails to allege sufficient facts from which the court may infer that a Turn Key policy or custom was the moving force behind those alleged constitutional violations.

Here, plaintiff alleges that "[t]o achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin," and, further, that Turn Key's contract with Tulsa County "incentivizes cost-cutting measures in the delivery of medical and

---

constitutional right. The distinction has been cited in countless cases, and it is clear that a municipal liability claim may be founded on *either* basis." *Sanders*, 138 F. Supp. 3d at 1256 (emphasis in original) (internal citation omitted). Here, plaintiff relies on *Monell* and its progeny.

mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care." [Doc. 2, ¶¶ 67-68]. Assuming these facts are minimally sufficient to allege the existence of a policy or custom of cost-saving, the Complaint fails to plausibly allege that any cost-saving policy was the moving force behind the constitutional violations.

In an unpublished decision, a Tenth Circuit panel found persuasive an unpublished decision of the Third Circuit discussing cost-saving policies. *See Sherman v. Klenke*, 653 F. App'x 580, 593 (10th Cir. 2016) (citing *Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011)).[7] Therein, the Third Circuit indicated that, to plausibly allege a cost-saving policy that was the moving force behind the constitutional violation, a plaintiff must allege "(1) what the relevant policies are, (2) what basis [plaintiff] has for thinking that policies to save money affected his medical treatment, [and] (3) what specific treatment he was denied as a result of these policies." *Prince v. Turn Key Health Clinics, LLC,* No. 18-CV-0282-CVE-JFJ, 2019 WL 238153, at *5 n.7 (N.D. Okla. Jan. 16, 2019). This court also finds *Winslow* persuasive.

Plaintiff identifies the relevant cost-saving measures as "chronic reliance on lower-level providers *e.g.,* practical nurses instead of nurses or physicians, to make threshold decisions regarding care or elevating care"; "chronic understaffing that impairs the ability of existing staff to complete contracted tasks in a timely manner"; "chronic understaffing that prevents Turn Key from timely responding to inmate requests for mental health care"; "absence of accountability in administration of physician prescribed medication"; and "underutilization of diagnostic techniques and technologies (x-rays, ultrasounds, MRI, etc.)." [Doc. 2, ¶ 69]. The Complaint includes no

---

[7] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1.

allegations from which the court may infer that those specific cost-saving measures caused the asserted constitutional violations. Plaintiff alleges chronic reliance on lower-level providers, but Martin and Constanzer are registered nurses (and defendant Cooper, whose motion to dismiss remains pending, is a physician). Plaintiff points to understaffing resulting in untimely medical responses, but the gravamen of plaintiff's Complaint is that the deceased was medically evaluated but no care was provided despite his worsening condition, not that care was untimely. Plaintiff identifies no specific tasks that were untimely. There are no allegations with respect to the administration of physician prescribed medicine.[8] Finally, plaintiff includes no allegations that a specific diagnostic technique or technology was required, how it would have affected his medical treatment, or a basis for the assertion that the denial of that care was the result of a cost-saving policy. Thus, plaintiff fails to state a plausible claim that a policy or custom of cost-saving caused the constitutional violation.

Plaintiff also relies on a failure to train grounds for municipal liability. As recognized by the U.S. Supreme Court, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To prevail, plaintiffs must "identify a *specific* deficiency" in the training "closely related to [the] ultimate injury." *Lopez*, 172 F.3d at 760 (emphasis added). Thus, to withstand a motion to dismiss, "[a municipal liability] claim must allege sufficient facts to show that a *specific* policy or custom

---

[8] The Complaint alleges that Turn Key had no medication available to stop Lee's seizure. [Doc. 2, ¶ 42]. However, the Complaint includes no allegations from which the court may infer that Turn Key did not stock seizure medication in order to save money. Further, a policy related to the "*administration* of physician prescribed medication," suggests an inadequacy in the actual administration of prescribed medication to the detainee—*i.e.,* failure to provide the medication or delivery of the wrong dose—rather than a failure to stock medication for any foreseeable medical event.

was the moving force behind the alleged violation." *Dalcour v. City of Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012) (emphasis added) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)) ("[A] municipality is liable only when the official policy is the 'moving force' behind the injury alleged.").

Plaintiff alleges that Turn Key has a policy, practice, or custom of providing undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor, or treat inmates with complex and serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs. [Doc. 2, ¶¶ 70-71]. Allegations of generalized deficiencies in training related to all aspects of care for inmates with "complex and serious medical needs" are too conclusory to support a plausible § 1983 municipal liability claim. *See Brashear v. Tulsa Cty. Bd. of Cty. Comm'rs,* No. 15-CV-473-GKF-PJC, 2016 WL 633374, at *3 (N.D. Okla. Feb.17, 2016); *Lopez v. City of Tulsa*, No. 09-CV-757-TCK-FHM, 2010 WL 3825395, at *6 (N.D. Okla. Sept. 27, 2010). For the same reasons, plaintiff's allegations of failure to supervise fail.

Finally, in the response, plaintiff argues that Turn Key "knew of and continued the unconstitutionally deficient health care delivery system previously maintained by Correctional Healthcare Companies, Inc. ('CHC') and Armor Correctional Health Services, Inc. ('Armor')." [Doc. 30, p. 20]. However, while the Complaint alleges that Turn Key "was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained," [Doc. 2, ¶ 65], the Complaint includes no allegations that Turn Key continued CHC's or Armor's policies. Rather, the Complaint includes allegations specific to Turn Key's contract with the County, [*Id.* ¶¶ 67-69], and Turn Key's "corporate policies." [*Id.* ¶¶ 73, 80]. The court does not consider

allegations contained in briefs, but not included in the operative pleading. *See Rezac Livestock Comm'n Co. v. Pinnacle Bank*, 255 F. Supp. 3d 1150, 1164 (D. Kan. 2017). Based solely on the allegations of the Complaint, plaintiff fails to state a plausible claim that Turn Key had a policy or custom of continuing the practices of its predecessors.

Based on the foregoing, plaintiff's § 1983 claim for *Monell* liability is dismissed without prejudice.

2.  *Respondeat Superior*

Relying on a Seventh Circuit decision, plaintiff also asserts that Turn Key may be liable under § 1983 pursuant to a *respondeat superior* theory because "[t]he federalism concern that compelled the *Monell* Court to erect a bar against *respondeat superior* liability for § 1983 claims against municipal entities has no application to Turn Key, a private entity." [Doc. 2, ¶ 83 (citing *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 795 (7th Cir. 2014)]. However, plaintiff cites no Tenth Circuit authority questioning the applicability of *Monell*'s prohibition against *respondeat superior* to private corporations, nor has the court identified any. Rather, courts in this Circuit consistently conclude that "*Monell* extends to private corporations and thus they cannot be held liable on a *respondeat superior* basis for their employees' conduct." *Sanders,* 138 F. Supp. 3d at 1255 n.3; *see also Bradshaw ex rel. Bradshaw v. Armor Correctional Health Servs., Inc.*, No. 17-CV-615-TCK-FHM, 2019 WL 1675148, at *7 (N.D. Okla. Apr. 17, 2019) ("It is well established that § 1983 does not impose vicarious liability based solely on the existence of an employer-employee relationship."). Thus, plaintiff's claim for *respondeat superior* liability under § 1983 must be dismissed with prejudice.[9]

---

[9] Because the court dismisses plaintiff's § 1983 claim, the court need not consider whether plaintiff may seek punitive damages against Turn Key.

B.  *State Law Negligence Claim*

This court has previously held that a private entity that contracted with the State to provide healthcare services was immune from tort liability under the Oklahoma Governmental Tort Claims Act, OKLA. STAT. tit. 51, §§ 151 *et seq,* as an "employee." *See* [Doc. 59, *Burke ex rel. Godsey v. Regalado*, No. 18-CV-231-GKF-FHM, at p. 2 (N.D. Okla. Mar. 28, 2019)]; *see also Burke ex rel. Godsey v. Regalado*, No. 18-CV-231-FHM, 2019 WL 1371144, at **2-3 (N.D. Okla. Mar. 26, 2019). Plaintiff does not discuss or attempt to distinguish the court's decision in *Burke*, although plaintiff cites to another order in that case for a different proposition. The court sees no reason to depart from its prior reasoning and, therefore dismisses plaintiff's negligence claim against Turn Key with prejudice. *See Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d. 233, 236 n.5 (Okla. 2018); *Birdwell v. Glanz*, No. 15-CV-304-TCK-FHM, 2019 WL 1130484, at *10 (N.D. Okla. Mar. 12, 2019); *Prince*, 2019 WL 238153, at *9.

**IV. Conclusion**

WHEREFORE, Defendant Turn Key Health Clinics, LLC's Motion to Dismiss with Prejudice [Doc. 20] is granted in part and denied in part.

Defendant's motion to dismiss with prejudice plaintiff's claim for *respondeat superior* liability under § 1983 and state-law negligence claim is granted.

Defendant's motion to dismiss plaintiff's § 1983 claim for *Monell* liability is denied to the extent that it seeks dismissal with prejudice. Plaintiff's § 1983 claim for *Monell* liability is dismissed without prejudice. If plaintiff elects to do so, he may file an amended pleading by March 19, 2020, as directed in the court's Order with respect to defendant Regalado's motion to dismiss.

IT IS SO ORDERED this 27th day of February, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE